## DOWNING et al. v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit.
October 30, 1929.

No. 5891.

Elton Watkins, Johnston Wilson, and H. P. Arnest, all of Portland, Or., for appellant Downing.

Joseph O. Stearns, Jr., of Portland, Or., for appellant Anderson.

Collier, Collier & Bernard, of Portland, Or., for appellant Gunther.

George Neuner, U. S. Atty., and Francis E. Marsh, Asst. U. S. Atty., both of Portland, Or.

Before DIETRICH and WILBUR, Circuit Judges, and LOUDERBACK, District Judge.

DIETRICH, Circuit Judge. In the first five counts of the indictment, the appellants, Downing, Anderson, and Gunther, and their codefendant, Collins, were charged with using the mails to defraud, under section 215 of the Penal Code (18 USCA § 338), and in the sixth, with a conspiracy to commit such offenses. Upon the first five counts all were convicted but upon the sixth they were acquitted. From the judgment entered upon the verdict all but Collins prosecute appeals.

The several counts relate to the same enterprise and in form are substantially identical; their sufficiency is not challenged. Appellants reside and resided in or near Portland, Or. Downing was a mining engineer, Gunther a retail merchant, and Anderson a bond and stockbroker. The enterprise involved had to do with the development and operation of some old mining properties near Las Cruces, N. M., known as the Bennett-Stevenson Group. At the time the enterprise was set on foot, no one of the appellants had ever seen the mine or had any personal knowledge in respect to it. Directly or indirectly the properties were brought to their attention through the representations of their codefendant, Collins, who held a contract for their purchase and professed to know personally that they were of great value.

As already stated, Downing was a mining engineer, but Gunther had had no experience in such matters; Anderson had dealt in mining stocks and securities and in a general way was familiar with mines. Having themselves become interested, the appellants entered upon an organized effort to procure from the public a part of the funds needed for the development and operation of the properties. In such effort the government contends they made false representations and used the mails for the purpose of carrying forward the alleged scheme to defraud. The period covered by the charges was about a year and a half prior and down to May 1, 1928. The organization was known as the Southwestern Silver Lead Association, and at first was in the nature of a common-law trust, but later became a corporation, of 1,000,000 shares of the par value of $1 per share. And these shares, except such part thereof as were held by the defendants and perhaps a few other persons initially interested with them in the enterprise, it was planned to sell to the public. The company took over Collins' option for the purchase of the properties from the then owners.

Specifically it is charged that the sale of the stock to the public was to be and was effected by making false representations touching the qualifications, standing, and experience of Collins as a mining engineer, and the standing of the other trustees of the company as men of high character and business experience, and by "lurid advertising" and false representations and promises touching the history and condition of the properties, their value, and the prospects of great profits from the operation thereof. Such advertising and representations are set forth specifically and in great detail, and the particular respects in which they are claimed to have been false are alleged. It is then charged, in the first count, that on October 15, 1926, defendants caused to be mailed to a named person one of the circulars got out for the company and designed to promote such sales; in the second, third, and fourth counts, that on the same day copies of such circular addressed to three different named persons were mailed; and in the fifth count it is alleged that on December 10, 1926, defendants caused to be mailed a personal letter to one George F. Heusner who, it may be said, was first approached by Collins in Portland and who introduced him to Downing,

this letter being over the signature of defendant Collins.

Without specifying any particular count, the judgment imposes a fine and imprisonment upon each defendant and runs against all of them for the costs of the prosecution, taxed at $2,279.

■ After the evidence was all in, its sufficiency to take the case to the jury was in no wise challenged in the court below, and hence no such question is before us.

Each of the three appellants took a separate appeal and, in the main, the assignments relied upon by each are distinct. Of all the appellants it may be fairly said they do not question that the mails were used as specifically charged in the several counts, and concede that at least some of the material representations alleged were made to the public in promoting the sale of stock and were, in fact, false and misleading. In substance, the defense of each is that he himself was deceived and misled, particularly by the representations of Collins, and that in so far as any one of the appellants had any connection with what was done or represented to the public, he was acting honestly and in good faith. It will be necessary to consider each appeal separately.

■ As to Downing: The first specification of this defendant relates to the action of the court in respect to certain letters grouped together and offered in evidence by him as a single exhibit. An objection to their reception was sustained. Upon the following day, however, in view of some new aspect of the evidence, the court advised counsel that he would be permitted to again offer the letters. As to what followed, the record is far from being clear but admittedly only certain of the letters included in the group were then offered. Apparently some of these were admitted and some excluded, but just what ones the record does not disclose. Seemingly all were letters written by Heusner to Downing or other parties after the alleged false representations were made to the public. Heusner is not a defendant, and the letters were not offered to impeach him as a witness, or at least no foundation was laid for their introduction for that purpose. The main object of the offer, in so far as we can discern, was to show that Heusner had some confidence in Downing and in the property, but we are unable to perceive how that would be material. Admittedly the property does not measure up to the representations made by Downing and his codefendants, and hence his defense must be that he, not Heusner, reasonably believed them to be true.

■ The next specification relates to certain instructions requested and the instructions given by the court on the subject of the weight to be given to the testimony of accomplices. It may be doubted whether the exceptions reserved were sufficient, but we consider the specification upon its merits. We need not set out the requests in full, for it is familiar law that a court is under no duty to instruct in any specific form. Of the two requests it may be said generally that without otherwise defining what is meant by the term "accomplice," the first would naturally convey the impression to the jury that any witness who had in any way had anything to do with the enterprise covered by the indictment is necessarily to be considered an accomplice (manifestly an erroneous view), and the second expressly referred to only "confessed" accomplices, and no witness so "confessed" or admitted. In considering the instructions given, these features of the request are to be borne in mind and also the fact that during the course of the trial—and it is fair to assume a like attitude was taken in the argument—there was manifest a disposition, on the part of some of the defendants at least, to cast the blame for the misrepresentations upon their codefendants. On the subject generally of the credibility of witnesses, the court pointedly drew the attention of the jurors to the consideration which should be given to the fact of interest, if it appeared that a witness had any interest in the outcome of the trial. And after all, accomplices constitute one class of interested witnesses, and, generally speaking, it is for that reason their testimony is to be weighed with care and accepted with caution. On the specific subject of accomplices the entire instructions of the court were as follows:

"There has been a request for instructions with respect to accomplices. If these defendants claim they are not guilty whether any of them would be considered accomplices may be a matter of doubt. Of course any of those that may be guilty are principals rather than accomplices. Perhaps it has been argued that some of the witnesses for the Government may be stated to be accomplices. In so far as may appear, however, the Court will say this: Whenever you consider the evidence, the testimony of an accomplice, one who admits —and there is none here who has admitted— that he himself was involved in some guilty transaction, if there was any, you want to scrutinize his testimony very closely, and ask yourself and determine for yourself whether or not he is not endeavoring to escape the consequences and make as good a case for

himself as he can, and as black a case as he can against the defendant to save himself and protect himself, either now or in the future in respect to another prosecution that he may fear.

"These four defendants, as I said before, all insist that they are innocent. I do not understand that any of them take the attitude that there are any of his fellows guilty. Perhaps there was some argument in behalf of the defendant Collins that the others of the accused were charging that, but remember, in weighing the evidence of any of the defendants, in so far as it bears adversely upon his codefendants that he may be endeavoring to lighten the burden upon himself in order to cast it heavier upon them. It will be for you to determine that as another matter in the case."

Abstractly and from a technical standpoint the limitation thus placed upon the meaning of the term "accomplice" is subject to criticism, but the attention of the court was not drawn to the subject by any appropriate exception, and besides when the instructions are considered as a whole we are unable to believe that the jurors could have been misled. They were not only emphatically told that in weighing his testimony they should consider the interest of a witness, but were also in effect informed that if any witness, whether defendant or not, was involved in any guilty transaction they should scrutinize his testimony closely for the purpose of determining whether it was not moulded and colored to shift the blame to some other person, and thus further his own interest. This is the gist of any proper instruction upon the subject.

His final contention, in substance, is that the instructions are argumentative in form and disclose a belief on the part of the trial judge in the guilt of the defendants. No exception upon this ground was suggested; and the jurors were expressly advised that whatever might be the views of the court they were not bound thereby, but that it was exclusively their right and duty independently to pass upon the issues of fact and to that end to determine the credibility of witnesses and the weight to be attached to their testimony. While we think the court's discussion of the evidence went to the limit of propriety, we cannot say that it exceeded the latitude recognized as permissible under the rule prevailing in the federal courts.

Turning now to the case of the defendant Anderson. As to his specification that the instructions "transgressed the limits of proper judicial comment," what we have just said upon that point in Downing's case will suffice.

In promoting the sale of the corporation's stock Anderson prepared and sent out by mail to prospective customers a large number of copies—apparently about 3,500—of a circular letter, dated October 15, 1926, containing highly extravagant and alluring statements touching the value of the properties and the profits to be expected from their operation. In the course of his testimony he stated: "I had a regular mailing list used in my promotions to whom those letters were mailed." In his argument to the jury the district attorney referred to such list as "this sucker list of Anderson's," whereupon Anderson's counsel objected to the characterization as being unwarranted and prejudicial, which objection the court overruled, adding that such lists are sometimes so referred to. Defendant excepted.

Referring to the mailing of these letters, the court in the course of the instructions to the jury said: "This very law involved here, this law is designed to protect (against) the practice in vogue of the vendor of valueless stocks, or stocks of some value at exaggerated figures, through the mails, using their mailing lists, as they call it, and very commonly called a sucker list. The government passed this law to stop the use of the mails. The government cannot prevent anyone from defrauding by the sale of stock." There was no suggestion on the part of counsel that the instruction be qualified or explained nor was any exception taken; and hence the propriety of the reference to "sucker list" is not open to consideration.

As to the argument of the district attorney to which exception was reserved, it is to be conceded that there is no evidence that generally Anderson was engaged in illegitimate business, but under his own testimony he was engaged in "promotions" involving the sale of mining and other stocks and used the mails for that purpose. Of course, such business may be conducted upon the highest plane with no thought of misrepresentation or deception, but whether because of the frequency with which enterprises without merit are so promoted or for other reasons such lists are more or less commonly referred to in popular speech as "sucker lists." The term does not necessarily suggest only people who are to be made the subjects of deception, but those who, though not deceived by misrepresentations of fact, are susceptible to the allurements of visionary and highly speculative enterprises with the hope of profits quick and great. In view

of the extraordinary character of the letter under consideration, we are inclined to think the language used by the district attorney was within the bounds of legitimate argument. Anderson was not a novice in business or without experience in the promotion of sales of mining and other stocks. That being true, it is difficult to avoid the conclusion that he himself must have thought that he was appealing to credulous prospects. Considering the inherent character of the letter, the district attorney could appropriately argue that experienced anglers presumably use bait suitable for the catch they desire to make.

■ The only other matter relied upon by this defendant is the overruling of his motion for a new trial. The single ground of the motion urged upon our attention is that of newly discovered evidence, such evidence being a letter from Gunther to Downing dated January 21, 1927. This, it will be noted, was long after the formation of the corporation (July 10, 1926) and the mailing of the circular letter (October 15, 1926). In substance the letter tends to show confidential relations between Downing and Gunther and want of candor on their part in their dealings with and disclosures to Anderson. It is difficult to understand on what theory it would have been competent as substantive evidence. And the evidence before the jury shows that at least as early as November 10, 1926, Anderson was advised by an agent whom he had sent to investigate the property that Downing and Gunther were not dealing fairly and frankly with him and that some of the representations made by Downing were grossly untrue; also, that later, and before or about the time the letter in question was written, there was an open break between Downing and this defendant. Both Downing and Gunther became witnesses and hence were subject to interrogation by Anderson, but, although having the knowledge we have already referred to, he did not seek to have them testify that they withheld from him any information or intentionally deceived him. Had he so interrogated them and had their testimony been out of harmony with the letter in question, it might have become competent and material for impeachment purposes, but, as the record stands, we are unable to see how it can be held to constitute any substantial ground for granting a new trial.

■ As to Gunther: Of him the court in the course of the instructions to the jury very aptly said: "The defendant Gunther seems not to have been very active in anything that was done. * * *" Without

training or experience in mining he was incapable of acquiring personal knowledge of or of exercising the most competent judgment, touching some of the representations made. People who knew him and dealt with him would not naturally expect him to have such knowledge or understand that he claimed to have it. There was before the jurors the admitted fact that he was one of the trustees of the company in whose name and upon whose behalf representations were made, some of which they learned were in fact false. There was a mass of evidence relating to the acts, declarations, and conduct of his codefendants and other persons, in which he had no part except upon the theory that he was a coconspirator or that knowingly he engaged with such others in a common scheme to deceive the public. It would not be unnatural for jurors to adopt the view that being a trustee he could not escape responsibility for what was done in its name and on its behalf. Under the circumstances properly to protect his rights it was important that the jurors be advised that in such a case guilt is personal, that assuming false representations were made as alleged, defendant could not be convicted merely because he was a trustee, and that the declarations of others could not be considered against him unless and until it was shown that he was participating in an enterprise the object of which he knew or should have known, was to defraud, and that if, considering all the circumstances, he honestly and reasonably believed the representations to be true, there was an absence of the requisite criminal intent. In short, it was essential that he act with knowledge of the falsity of the representations or with such recklessness as to imply a willingness to profit by deceit. Seasonably he requested the giving of instructions substantially incorporating these views but they were not given. Of course, the court was not bound to give the requests in the precise form in which they were offered, and it may be conceded that in the voluminous charge statements may be found which, if isolated, might be understood as either expressly or by implication covering the ground. But when considered as a whole, we do not think the charge measured up to the defendant's just demand. Admittedly, nowhere did it expressly or clearly negative the proposition that being a trustee and his company having made untrue representations to the public in promoting the sale of its stock, he is to be held responsible for such falsity, or advise the jury that he was not bound by the acts and statements of others

in which he had no part and of which he had no personal knowledge, unless and until it was shown that he was knowingly engaged with such others in a scheme to defraud.

As to Downing and Anderson the judgment will be affirmed, and as to Gunther it will be set aside with directions to grant him a new trial.